IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PIZZA HUT, INC.,            §
                                §
      Plaintiff,            §
                                §
v.                               §           Civil Action No. 3:11-CV-0011-N
                                §
LUNDY ENTERPRISES, LLC, *et al.*,   §
                                §
      Defendant.          §

## ORDER

This Order addresses Plaintiff Pizza Hut, Inc.'s, ("Pizza Hut") motion to dismiss or, alternatively, to strike counterclaims and certain affirmative defenses [20]. For the following reasons, the Court grants in part and denies in part Pizza Hut's motion to dismiss, strikes Defendants Lundy Enterprises, LLC ("Lundy Enterprises"), Larry Lundy, and Marilyn Lundy's ("the Lundys," and together with Lundy Enterprises, "Lundy") fraud-based affirmative defenses, and grants Lundy leave to replead.

## I. ORIGINS OF THE PIZZA HUT-LUNDY DISPUTE

As the Court must, it recites the well-pled facts giving rise to this dispute as true and in the light most favorable to Lundy. In the 1980s, Larry Lundy, a New Orleans native, rapidly climbed the corporate ladder at Pizza Hut's then-parent company, PepsiCo, eventually reaching the position of Vice-President of Development. In that position, Lundy "oversaw the development of approximately fifteen hundred (1,500) new Pizza Hut stores." Lundy's Answer, Affirmative Defenses, and Counterclaim at 10 ("Lundy's Answer") [15].

In the early 1990s, Pizza Hut's leadership asked Larry Lundy to take over a swath of failing Pizza Hut stores in the New Orleans area. He agreed, selling his PepsiCo stock options to use as a down payment on thirty-one Pizza Hut stores worth about $15 million. The move "made [Lundy Enterprises] the country's largest minority-owned franchisee." *Id.* at 11. Lundy Enterprises eventually expanded to Baton Rouge, and at its peak operated sixty-seven Pizza Hut stores in Louisiana.

For the past decade or so, however, Pizza Hut and Lundy have had a rocky relationship. The once-promising partnership soured for a number of reasons; Lundy Enterprises's profit margins declined. Pizza Hut defaulted Lundy for failing to comply with various provisions of their franchise agreements. A third party related to PepsiCo unexpectedly withdrew certain loan guarantees, forcing Lundy Enterprises into Chapter 11 bankruptcy. Lundy's restructuring suffered a setback when Hurricane Katrina devastated New Orleans in August 2005. The storm damaged thirty-eight of Lundy's stores, nine so severely that the locations permanently closed. Pizza Hut refused to allow Lundy to incorporate certain new brand concepts. And, over time, Pizza Hut opened independent stores in direct competition with Lundy.

The parties' disagreements eventually culminated in efforts to cede control of Lundy's network of stores to Pizza Hut. After a series of unsuccessful attempts to establish the value of Lundy's network, the parties mediated in July 2010 and signed an agreement that, among other things, submitted responsibility for determining fair market value to an arbitration proceeding to convene in October (the "Settlement Agreement"). *See* Lundy's Answer Ex. A. The Settlement Agreement also obligated the parties to enter into another, separate

agreement specifying the procedures for effecting the sale terminating Lundy's various franchise agreements (the "Asset Purchase Agreement"). *See* Pizza Hut's Compl. Ex. B [1-2]. If the arbitration panel determined that the fair market value of Lundy's network fell short of the amount of its encumbrances, the Settlement Agreement allowed Lundy a fourteen day period in which to negotiate down – with certain assistance from Pizza Hut – the amount of Lundy's outstanding liens (the "Negotiation Period").

Due to scheduling delays, the arbitration occurred in mid-December. The arbitrators set the value of Lundy's network at $7.8 million, an amount low enough to trigger the Negotiation Period. Given the arbitration's delayed timing, the Negotiation Period overlapped both Christmas and New Year's Day. Unable to meet with third parties during the holidays, Lundy encountered difficulty in reducing its lien obligations. Lundy requested that Pizza Hut provide lien-clearing assistance and extend the Negotiation Period. Pizza Hut refused. On Sunday, January 2, 2011,[1] Pizza Hut terminated both the Asset Purchase Agreement and Lundy's license to operate Pizza Hut stores. The next day, Pizza Hut filed this action for trademark infringement, unfair competition, and breach of contract, and publicly announced the closure of Lundy's forty-four stores then in operation.

Lundy answered and asserted counterclaims against Pizza Hut for allegedly breaching various provisions of the Settlement and Asset Purchase Agreements, acting contrary to the implied covenant of good faith and fair dealing, and tortiously interfering with Lundy's distribution agreement with McLane Food Services ("McLane"), Lundy's sole vendor of

---

[1]The parties dispute the appropriate end date. Lundy argues that the Negotiation Period included January 2nd, but Pizza Hut believes that it ran through only January 1st.

Pizza Hut-approved foods.  Pizza Hut now moves to dismiss Lundy's counterclaims under

Rule 12(b)(6).  In the alternative, Pizza Hut argues that the Court should strike over seventy

paragraphs from Lundy's factual allegations and two fraud-based affirmative defenses.

## II. THE COURT APPLIES LOUISIANA LAW

The Court takes up first the parties' disagreement over the law governing Lundy's

counterclaims.  The Lanham Act supplies federal question jurisdiction over Pizza Hut's

claims, but Lundy brings exclusively state-law counterclaims.  The Court therefore must

abide by Texas's choice of laws rules.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S.

487 (1941); *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663,

681 (7th Cir. 1986) (collecting cases in which "federal courts, reasoning by analogy from

diversity cases, have applied *Klaxon* to determine what law governs pendent state claims");

*accord Snow v. WRS Grp., Inc.*, 73 F. App'x 2, 5 (5th Cir. 2003) (citing *Baltimore Orioles*).

In the absence of a valid contractual choice of law provision, Texas courts adhere to

the "most significant relationship" factors outlined in the *Restatement (Second) of Conflict

of Laws* and analyze choice of law on an issue-by-issue basis.[2]  *See, e.g., Hughes Wood

Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000) (citing RESTATEMENT (SECOND) OF

CONFLICT OF LAWS (1971)) [hereinafter "*Restatement (Second)*"]; *Duncan v. Cessna Aircraft*

---

[2]Seven nonexclusive general factors guide courts' choice of law analyses:
a) the needs of the interstate and international systems; b) the relevant policies
of the forum; c) the relevant policies of other interested states and the relative
interests of those states in the determination of the particular issue; d) the
protection of justified expectations; e) the basic policies underlying the
particular field of law; f) certainty, predictability, and uniformity of result; and
g) ease in determination and application of the law to be applied.
*Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403-04 (5th Cir. 2004) (citing RESTATEMENT
(SECOND) § 6(2)).

*Co.*, 665 S.W.2d 414, 421 (Tex. 1984) (issue-by-issue consideration); *see also Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004). The "most significant relationship" factors vary depending on the type of substantive claim. Relevant here, the *Restatement (Second)* provides two different tests for claims sounding in contract or tort. For both tests, "[a]lthough the number of contacts is relevant, the qualitative nature of the contacts controls." *Jackson v. West Telemarketing Corp. Outbound*, 245 F.3d 518, 523 (5th Cir. 2001) (citation omitted).

### A. The Court Applies Louisiana Law to Lundy's Breach of Contract Claims

For a breach of contract claim, Texas courts determine the state with the "most significant relationship" to the dispute in light of five factors: "(a) the place of contracting, (b) the place of negotiation, (c) the place of performance, (d) the location of the subject matter, and (e) the domicile, place of incorporation, and place of business of the parties." *Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 233 (Tex. 2008) (citing RESTATEMENT (SECOND) § 188(2)). Lundy argues for the application of Louisiana law. Pizza Hut contends Texas law controls.[3]

Pizza Hut, however, concedes that "Louisiana law does not differ from Texas law on the elements required to plead a claim for breach of contract." Pizza Hut's Mot. at 6 n.1. Because the Court holds that Louisiana law governs Lundy's other counterclaims, the Court applies Louisiana law to Lundy's breach of contract claims. *See, e.g.*, *R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005) (noting, in case implicating application of Texas or Louisiana breach of contract elements, that "[w]here there are no differences

---

[3]The parties do not identify a controlling choice of law provision.

between the relevant substantive laws of the respective states, there is no conflict, and a court need not undertake a choice of law analysis" (citing *Vandeventer v. All Am. Life & Cas. Co.*, 101 S.W.3d 703, 711 (Tex. App. – Fort Worth 2003, no pet.).

### B. Louisiana Law Applies to Lundy's Tort Claims

For claims sounding in tort, Texas courts apply a four factor test to determine choice of law: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Hughes Wood*, 18 S.W.3d at 205 n.1 (citing RESTATEMENT (SECOND) § 145(2)). The parties again dispute the appropriate governing law. Lundy argues for Louisiana law, Pizza Hut for Texas law.[4]

The Court holds that Louisiana law applies to Lundy's tort claims. The Court finds that three of the four *Restatement (Second)* factors weigh strongly in Lundy's favor. Lundy operated Pizza Hut stores in Louisiana. The Settlement Agreement and the Asset Purchase Agreement concerned Lundy's Louisiana network and envisioned the transfer of control of

---

[4]Pizza Hut believes that if Texas law controls Lundy's breach of contract claims, Texas law must also apply to Lundy's claim for breach of the covenant of good faith and fair dealing. *See* Pizza Hut Mot. at 10 n.2 (citing *Caton v. Leach Corp.*, 896 F.2d 939, 942-43 (5th Cir. 1990)). *Caton*, however, recognized that claims for breach of the duty of good faith and fair dealing sound in tort, not contract. And, the parties in that case agreed that the choice of law provision in their contract also "applied to [the plaintiff's] claims that [arose] independently from the [contract at issue]." 896 F.2d at 943.

Here, the parties dispute the law governing all of Lundy's tort claims, and the relevant contracts lack choice of law provisions. Absent a choice of law stipulation similar to that in *Caton*, the Court must analyze Lundy's tort claims separately and apply the *Restatement (Second)*'s tort-claim factors. Thus, even if the Court applied Texas law to Lundy's breach of contract claims, that decision would not dictate that the Court also apply Texas law to Lundy's claim for breach of the implied covenant of good faith and fair dealing.

that network from Lundy to Pizza Hut.  Pizza Hut's actions allegedly resulted in the closure of those stores as well as the termination of Lundy's Louisiana-focused distribution agreement with McLane.  Lundy allegedly suffered damages in Louisiana.  And, the parties' relationship was centered in Louisiana.

The Court finds that the remaining choice of law factor does not militate in favor of applying Texas law.  Although Pizza Hut's principal place of business is in Texas, it is organized as a California corporation.  In practice, Pizza Hut does business nationwide, but this dispute specifically concerns Pizza Hut's Louisiana operations.  Lundy is organized, resides, and almost exclusively does business in Louisiana.  The Court therefore applies Louisiana law.

### III. LUNDY STATES SOME CLAIMS, BUT NOT OTHERS

Pizza Hut move to dismiss all of Lundy's counterclaims, arguing that none states valid claims under Rule 12(b)(6).  The Court dismisses Lundy's tortious interference claims.  By Lundy's own admission, his claim for tortious interference with contract falls outside the narrow circumstances requisite to support that claim under Louisiana law.  And, Lundy fails to state facts that support recasting the claim as one for tortious interference with business relations.  The remainder of Lundy's claims survive.

### A. Rule 12(b)(6) Standard

When faced with a Rule 12(b)(6) motion to dismiss, the Court must determine whether the plaintiff has asserted a legally sufficient claim for relief.  *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).  According to the Supreme Court, a viable complaint must include "enough facts to state a claim to relief that is plausible on its face," i.e., "enough

fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim or element]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). A plaintiff is required to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. (internal citations omitted).

As the Supreme Court recently observed:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. [*Iqbal v. Hasty*,] 490 F.3d 143, 157-158 [(2d Cir. 2007)]. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" – "that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

ORDER – PAGE 8

*Iqbal*, 129 S. Ct. at 1949-50.

In ruling on a Rule 12(b)(6) motion, the court generally limits its review to the face of the pleadings, accepting as true all well-pleaded facts and viewing them in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Courts may also reference materials attached to the pleadings, including documents attached to a motion to dismiss so long as they "are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (reasoning that "[i]n so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated") (internal quotation marks, citation, and footnote omitted).

### B. Lundy States Claims for Breach of the Settlement Agreement

Under Louisiana Law, "[t]he essential elements of a breach of contract claim are (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Favrot v. Favrot*, 2011 WL 458708, at *7 (La. Ct. App. 4th Cir. 2011) (publication pending) (citations omitted). Lundy contends that Pizza Hut breached the Settlement Agreement by making disparaging remarks "in multiple statements and press releases," "fail[ing] to act commercially reasonable . . . in providing [Lundy Enterprises] a fair opportunity to clear the liens on [its] assets during the Negotiating Period," and "fail[ing] to exhaust all administrative remedies prior to filing" suit. Lundy's Answer at 30. Lundy alleges that Pizza Hut also violated the Asset Purchase Agreement "by divulging confidential information about the settlement between the parties in public statements." *Id.* at 31.

Pizza Hut argues in response that Lundy identifies no disparaging remarks or confidential information; that the Settlement Agreement precludes Lundy's failure-to-act-commercially-reasonable claim; that counterclaims constitute an inappropriate remedy for a failure to mediate; and that Lundy fails to connect damages to any of the purported breaches. Pizza Hut's Mot at 6-10.

***1. Lundy States that Pizza Hut Failed to Honor Its Promise to Mediate.*** — Lundy argues that Pizza Hut breached the Settlement Agreement by ignoring its mediation provision and instead proceeding directly with this suit. If Lundy desired mediation, Pizza Hut responds, then it should have filed a motion to stay this litigation, drawing an analogy to and citing cases concerning arbitration. Because Lundy instead filed counterclaims, Pizza Hut contends that Lundy has waived the issue and, in any case, cannot state a claim for breach of contract based on a failure to mediate. *See* Pizza Hut's Mot. at 8.

The Court disagrees.[5] The Settlement Agreement does discuss arbitration, but it does so in the context of outlining the procedure to establish the value of Lundy's stores – not to set forth the parties' intentions concerning dispute resolution. The clause accomplishing that task provides only that, "in the event a dispute arises under this agreement, the parties will mediate w/ Hesha Abrams, PH to pay to costs." Settlement Agreement ¶ 25. And, an agreement only to mediate falls outside Federal Arbitration Act's reach. *See* 9 U.S.C. § 1, *et seq.*; *Advanced Body Care Solutions, LLC v. Thione Int'l, Inc.*, 524 F.3d 1235, 1239-41

---

[5]In considering whether to order a dispute to arbitration, "[c]ourts are limited to determinations regarding whether a valid agreement to arbitrate exists and the scope and enforcement of the agreement, including the arbitrability of given underlying disputes under the agreement." *Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 486 (5th Cir. 2002) (citations omitted).

(11th Cir. 2008) (holding that a "bright line rule" placing mediation outside the Arbitration Act's scope "makes sense not only in light of the FAA's statutory structure but its statutory purpose as well"); *cf. Covington v. Aban Offshore Ltd.*, No. 10-40449, at 4 (5th Cir. Aug. 10, 2011) ("A court may compel arbitration only if it concludes that the parties 'ma[de] . . . the agreement for arbitration.'" (quoting 9 U.S.C. § 4)) (alterations in original); *Gen. Motors Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 246 (5th Cir. 1998) ("Arbitration is the reference of a particular dispute to an impartial third person chosen by the parties to a dispute who agree, in advance, to abide by the arbitrator's award issued after a hearing at which both parties have an opportunity to be heard." (collecting authorities)).  Because mediation would not have submitted this dispute to an alternative adjudicator possessing authority to render a final and binding resolution, Lundy had no obligation to see that claims arising under the Settlement Agreement proceed in another forum.[6]  *Cf. Advanced Bodycare*, 524 F.3d at 1240 ("Unlike submitting a dispute to a private adjudicator, which the FAA contemplates, compelling a party to submit to settlement talks it does not wish to enter and which cannot resolve the dispute of their own force may well increase the time and treasure spent in litigation.") (emphasis removed).

      Lundy also need not move to stay this case in order to obtain remedies based on Pizza Hut's failure to mediate.  Lundy's claim differs from a motion to compel or stay in a critical

---

[6] *See also* Thomas Stipanowich, *The Arbitration Penumbra: Arbitration Law and the Rapidly Changing Landscape of Dispute Resolution*, 8 Nev. L.J. 427, 447 (2008) ("[T]he law of arbitration is in nearly every respect an illogical foundation for enforcement of mediation agreements.  Although a desperate lawyer or ill-informed court may use arbitration law as a convenient hook for ordering parties to mediation, it means forcing a square peg into a round hole.") (footnote omitted).

respect: it does not seek to force Pizza Hut to mediate. Lundy instead seeks damages, and damages are a distinct remedy from compelled mediation.

To that end, Lundy alleges that the Settlement Agreement required Pizza Hut to first attempt resolution of this dispute through mediation. Because Pizza Hut did not, Lundy claims to have suffered damages including "[a]ttorneys' fees and costs of suit."[7] Lundy's Answer at 31. Accordingly, the Court finds that Lundy sufficiently states that Pizza Hut breached the Settlement Agreement by failing to honor its mediation provision.[8]

### 2. Lundy States a Claim for Breach of the Asset Purchase Agreement's Confidentiality Provision. —

Pizza Hut also moves to dismiss Lundy's claim for breach of contract based on the Asset Purchase Agreement. The Asset Purchase Agreement contains two sections potentially applicable to Pizza Hut's claim. First, section 8.7, titled "Confidential Information," provides in relevant part that the Asset Purchase Agreement, "the terms of the transactions contemplated by [the] Agreement, and any other information heretofore or hereafter disclosed or obtained in connection with [the] Agreement concerning the business, operations, affairs, or financial condition of any party . . . will be kept

---

[7]Lundy may ultimately be unable to prove that the alleged breach (failure to mediate) caused the alleged damages (attorneys' fees and costs), i.e., that this dispute would have settled in mediation. That is not a matter the Court can address in a Rule 12(b)(6) motion.

[8]Pizza Hut's cited authority does not militate to the contrary. *See 5436, LLC v. CBS Corp.*, 2009 WL 3378379, at *12 (S.D. Tex. 2009). The *CBS* Court had previously determined that the plaintiff there was not even a party to the arbitration agreement on which the defendant premised its breach of contract counterclaim. *Id.* The court did observe that the Arbitration Act "does not 'authorize compensation by a court to parties in the form of damages [based on a failure to arbitrate] prior to issuance of an arbitral award'" *Id.* (quoting *Gulf Guaranty*, 304 F.3d at 487). But, that principle plainly does not apply in the context of an agreement to mediate falling outside the Arbitration Act's purview.

confidential" except under certain, limited circumstances.  Section 8.13(a) also prohibits Pizza Hut from "mak[ing] any announcement to the public concerning the transactions contemplated by the [Asset Purchase] Agreement" without Lundy's prior consent.  Notably, both provisions were intended to survive the Asset Purchase Agreement's termination.  *See* Asset Purchase Agreement ¶¶ 8.7, 8.13(c).

Lundy sufficiently alleges that Pizza Hut breached the Asset Purchase Agreement. Lundy claims that Pizza Hut "divulg[ed] confidential information about the settlement between the parties in public statements."  Lundy's Answer at 31.  That information related to "the businesses and their financial conditions."  *Id.*  Although Pizza Hut contends that Lundy must identify the specific confidential information allegedly disclosed, Lundy's claim falls within the broad sweep of the applicable Asset Purchase Agreement provisions.  Under them, the disclosure of *any* information concerning the parties' agreement or financial conditions would constitute a breach of the Asset Purchase Agreement.  Pizza Hut, moreover, does not argue that one of section 8.7's exceptions applies.  Accordingly, the Court declines to dismiss this portion of Lundy's breach of contract claim.

### 3. Lundy Sufficiently States That Pizza Hut Breached the Settlement Agreement's Nondisparagement Clause. —

Lundy states a claim for breach of contract premised on Pizza Hut's allegedly disparaging comments.  The Settlement Agreement contains a clause that obligates the parties to engage in "mutual non-disparagement between [themselves] & to others."  Settlement Agreement ¶ 12.  It does not explain what the parties construed "disparagement" to mean, but Black's defines the term primarily as "[a] derogatory comparison of one thing with another."  BLACK'S LAW DICTIONARY 503 (8th ed. 2004).

Black's also cross-references that definition to the term "trade disparagement," which constitutes a "common-law tort of belittling someone's business, goods, or services with a remark that is false or misleading but not necessarily defamatory." *Id.* at 1530.

In that vein, Lundy alleges that in the days immediately after Pizza Hut terminated the Asset Purchase Agreement, Pizza Hut made public statements concerning its purported alliance with the "National Urban League to help find jobs for the hundreds of former [Lundy Enterprises] workers who were out of a job with the sudden and unexpected closure of [Larry] Lundy's forty-four stores." Lundy's Answer at 27. According to Lundy, those statements "implicitly suggested that [the workers] lost their jobs through the fault of the Lundy parties." *Id.* Although Pizza Hut questions whether Lundy can state a claim based on implied disparagement, the Court concludes that Pizza Hut's alleged statement constitutes a fact tending to show that Pizza Hut engaged in communications designed to contrast the parties, to Lundy's detriment, based on both their concern for suddenly displaced Lundy Enterprises employees and their respective responsibility for the store closures. Lundy also alleges that Pizza Hut, through its press releases, "cast multiple aspersions on [Lundy Enterprises] and [Larry] Lundy, personally." *Id.* at 27-28. If true, these allegations adequately state a claim for breach of the nondisparagement provision.

### 4. Lundy Sufficiently States that Pizza Hut Withheld Lien-Clearing Assistance. —

Lundy also claims that Pizza Hut failed to act commercially reasonable during the Negotiation Period. Lundy's formal claim alleges that Pizza Hut "breached the Settlement Agreement as it failed to act commercially reasonable in accordance with the Settlement Agreement in providing [Lundy Enterprises] a fair opportunity to clear the liens on assets

during the Negotiating Period as more fully described herein." *Id.* at 30. Pizza Hut interprets this claim to concern only Pizza Hut's refusal to extend the Negotiation Period beyond fourteen days. Lundy does claim to have lost several days that would otherwise have been spent negotiating down liens to the holiday season, and alleges that Pizza Hut reasonably should have extended the Negotiation Period. Pizza Hut, however, correctly argues that nothing in the Settlement Agreement itself obligated Pizza Hut to allow Lundy more than a fourteen-day Negotiation Period. *See* Pizza Hut Mot. at 8 ("The Settlement provides that 'prior to the election of rescission, [Pizza Hut] agrees to use commercially reasonable efforts to assist Lundy Enterprises to satisfy an[y] encumbrance on the assets . . . *not to continue beyond 14 days*.'") (emphasis and omission in original; quoting Settlement Agreement ¶ 24). Thus, to the extent Lundy claims Pizza Hut breached the Settlement Agreement by refusing to extend the Negotiation Period, that claim fails.[9]

Yet, Lundy targets more than Pizza Hut's failure to extend the Negotiation Period in this aspect of its breach of contract claim. Lundy also contends that Pizza Hut failed to act commercially reasonably by refusing to assist Lundy in clearing liens, Lundy's Answer at 27, 30 (citing Settlement Agreement ¶ 24), "all of which [Pizza Hut] knew were to be paid from the proceeds of the award as determined in the Arbitration." *Id.* at 27. The relevant clause, omitted from Pizza Hut's citation above, requires Pizza Hut to "use commercially reasonable efforts to assist Lundy to satisfy any encumbrance on the assets *through the use*

---

[9]As the Court discusses in more detail below, the essence of this claim survives under Lundy's claim for breach of the covenant of good faith and fair dealing.

*of the sale proceeds*, not to continue beyond 14 days." Settlement Agreement ¶ 24 (emphasis added).

At first glance, this provision seems somewhat odd. Pizza Hut, after all, argues that Lundy's failure to clear the liens justified terminating the Asset Purchase Agreement, and there could have been no sale proceeds unless the parties consummated the sale of Lundy's franchise network. Lundy clarifies this ambiguity in its response: the Settlement Agreement provision tasked Pizza Hut with the "responsibility to use commercially reasonable efforts to facilitate the Lundy Parties' ability to clear [the] liens through third-party financing." Lundy's Resp. at 5 (citing Lundy Answer ¶ 96 (citing Settlement Agreement ¶ 24)) [26].

Lundy contends that Pizza Hut refused to comply with that obligation. Accordingly, Lundy sufficiently states that Pizza Hut breached the Settlement Agreement by failing to use commercially reasonable efforts to assist Lundy in satisfying outstanding liens during the Negotiation Period.[10]

### C. Lundy States a Claim for Breach of the Covenant of Good Faith and Fair Dealing

"As a general rule, Louisiana recognizes an implied covenant of good faith and fair dealing in every contract." *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) (citing *Brill v. Catfish Shaks of Am.*, 727 F. Supp. 1035, 1039 (E.D. La. 1989));

---

[10]The Court declines to dismiss Lundy's breach of contract claims for inadequately pleading damages. *See* Pizza Hut's Mot. at 9-10 (citing *In re American Airlines, Inc., Privacy Litig.*, 370 F. Supp. 2d 552, 567 (N.D. Tex. 2005) (Fitzwater, C.J.)). Lundy pleads that it has "suffered substantial damages," in the form of compensatory and consequential damages and attorneys fees, "[a]s a result of [Pizza Hut's] contractual breaches." Lundy's Answer at 31. This sufficiently states that Lundy seeks damages for all three remaining breach of contract claims, and each claim plausibly relates to each form of sought-after damages. Accordingly, Lundy need not identify with greater specificity "which damages flow from which breach." Pizza Hut's Mot. at 10.

*see also* LA. CIV. CODE arts. 1759, 1983.  Louisiana, as the only state yet to adopt the UCC,[11]

"measure[s] [good faith not] by a higher objective standard, but by a subjective standard.  A

mere failure to fulfill an obligation, without a showing of intent or ill will, does not constitute

a breach of good faith [under Louisiana law]."  *Brill*, 727 F. Supp. at 1041.  "Although it is

clear that 'bad faith' or 'lack of good faith' . . . means something more reprehensible than

ordinary negligence, imprudence or want of skill, it is apparent that [Louisiana] courts have

perceived the terms to include some forms of gross fault as well as intentional and malicious

failures to perform."  *Am. Bank & Trust of Coushatta v. FDIC*, 49 F.3d 1064, 1068 (5th Cir.

1995) (quoting *Great Sw. Fire Ins. Co. v. CNA Ins. Cos.*, 557 So.2d 966, 969 (La. 1990))

(emphasis removed).[12]  "The implied obligation to execute a contract in good faith,"

however, "usually modifies the express terms of the contract and should not be used to

override or contradict them."  *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480,

485 (5th Cir. 1984) (citation omitted).

Lundy sufficiently alleges that Pizza Hut acted in bad faith by injecting prohibited

matters into the asset valuation arbitration and in failing to make commercially reasonable

efforts to assist Lundy during the Negotiation Period.  Lundy contends that the Settlement

Agreement forbade Pizza Hut from raising a number of issues before the arbitration panel.

Lundy's Answer at 33.  Pizza Hut apparently does not dispute Lundy's characterization of

---

[11]*See Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1318 n.16 (S.D. Fla. 1999).

[12]The *American Bank* Court later disregarded as dicta the Louisiana Supreme Court's attempt to define bad faith or the lack thereof, making an *Erie* guess that the terms extended only to intentional and malicious failures to perform and not gross fault.  49 F.3d at 1068-69 (citing LA. CIV. CODE art. 1997 cmt. c).

the relevant Settlement Agreement provisions, choosing instead to argue that its "conduct and statements made in a judicial proceeding are privileged and [therefore] cannot form the basis of a claim" for breach of the duty of good faith and fair dealing. Pizza Hut's Mot. at 12. But, Pizza Hut's authorities on this account pertain to post-judgment defamation claims premised on statements made in court or during arbitration. *See, e.g.*, *Dallas Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 238 (Tex. App. – Dallas 2000, pet. den.) ("Communications and publications made in the due course of a judicial proceeding will not serve as the basis of a *defamation* action.") (emphasis added) (citations omitted). Pizza Hut does not argue that the Court should construe Lundy's claim as one for defamation. And, Lundy clearly links Pizza Hut's alleged bad faith introduction of evidence with the arbitrators' purportedly inadequate valuation, not Pizza Hut's allegedly disparaging remarks. The Court therefore declines to dismiss this aspect of Lundy's bad faith/fair dealing claim.[13]

Lundy also claims that Pizza Hut failed to act with good faith and to deal fairly with Lundy during the Negotiation Period in two ways. First, Lundy alleges that Pizza Hut intentionally refused to honor its contractual duty to assist Lundy in securing third-party financing. This, according to Lundy, breached the Settlement Agreement's express terms and amounted to an intentional and "unconscionable practice[]" designed to bring about the condition precedent to terminating the Asset Purchase Agreement, allowing Pizza Hut to essentially "usurp the Lundy Network . . . without paying any money to the Lundy Parties." Lundy's Answer at 34. As evidence of Pizza Hut's ill-will and intent to disregard the

---

[13]Whether this claim is an impermissible collateral attack on the arbitration is not presently before the Court.

Settlement Agreement, Lundy contrasts Pizza Hut's failure to provide assistance with its finding time during the same period to prepare for litigation and a coordinated public relations campaign, both commenced on the first business day after the Asset Purchase Agreement's termination and the day following Pizza Hut's issuing a cease and desist letter. In total, these allegations set forth a plausible claim for breach of the duty of good faith and fair dealing.

Second, Lundy alleges that Pizza Hut breached its implied duty in refusing to extend the Negotiation Period. The Court notes at the outset that this conclusion does not conflict with its dismissing Lundy's claim for breach of contract for failure to extend the Negotiation Period. "The law does not allow the implied covenant of good faith and fair dealing to be an everflowing cornucopia of wished-for legal duties; [and] indeed, the covenant cannot give rise to new obligations not otherwise contained in a contract's express terms." *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996) (discussing implied duty under Missouri law). But, at the same time, "[t]he implied covenant simply prohibits one party from "depriv[ing] the other party of its expected benefits under the contract." *Id.* (citations and internal quotation marks omitted) (alteration in original). And, under Louisiana law, the question of whether the Settlement Agreement required Pizza Hut to extend the Negotiation Period is distinct from whether Pizza Hut acted in good faith in refusing to do so. *Cf. N-Y Assocs. v. Bd. of Comm'rs*, 926 So.2d 20, 24 (La. Ct. App. 4th Cir. 2006) (distinguishing the question of whether a party "had the right to terminate the contract at will" from the "question . . . [of] whether or not that right was exercised in good faith as required by the Civil Code").

ORDER – PAGE 19

Louisiana law mandates that "[g]ood faith shall govern the conduct of the obligor and the obligee in *whatever* pertains to the obligation." LA. CIV. CODE art. 1759 (emphasis added). The Louisiana Civil Code lacks a definition for "good faith," but the Fifth Circuit has interpreted the concept, "'as understood in modern [Louisiana] law,'" as that which

> binds the parties to a contract to cooperate with each other in order to attain the mutual end for which they entered into the agreement. In that perspective, an obligee who, without justification, prevents the obligor's performance, or conceals from the obligor facts that, to the obligee's knowledge, would cause the obligor to fail to perform, or even facts that would make the latter's performance exceedingly difficult, thereby refuses the cooperation he owes the obligor . . . .

*Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 398 (5th Cir. 2006) (quoting 6 SAUL LITVINOFF, LOUISIANA CIVIL LAW TREATISE PART II § 5.32 (2d ed. 2001)) (ellipsis in original). Whether Lundy states that Pizza Hut acted in bad faith in failing to the extend the Negotiation Period, then, turns on whether Lundy alleges facts plausibly showing that Pizza Hut denied Lundy some expected benefit of the Settlement Agreement or unjustifiably failed to cooperate with Lundy in a way that effectively prevented the parties from "attain[ing] the mutual end for which they entered into the [Settlement] [A]greement" – consummating the sale of Lundy's network. *Id.*

Lundy alleges sufficient facts to that end. At the time they signed the Settlement Agreement, the parties anticipated the Asset Purchase Agreement being signed in August and the asset valuation arbitration taking place in October in order to allow "adequate time to have a closing date occur upon the conclusion of the arbitration." Settlement Agreement ¶¶ 13, 16; Settlement Agreement Ex. A ¶ 5; *see also* Lundy's Answer at 26. Both events actually transpired in December; the parties executed the Asset Purchase Agreement on

December 1, 2010, and the arbitration concluded on December 18th. This forced the Negotiation Period to run during the holiday season, "between two major holidays in which ordinary day-to-day business operations [were] interrupted." Lundy's Answer at 26. Lundy claims that this "[made] it all but impossible for [Lundy Enterprises] to arrange for the necessary meetings [with third parties] to effectively clear what liens there were on [its] assets." *Id.* Despite changed circumstances, Pizza Hut refused to extend the Negotiation Period.

As noted above, the Settlement Agreement provided that Pizza Hut was to "use commercially reasonable efforts to assist Lundy to satisfy any encumbrance on the assets through the use of the sale proceeds, not to continue beyond 14 days." Settlement Agreement ¶ 24. Although that provision obligated Pizza Hut to help Lundy for a fourteen-day period, it did not expressly forbid Pizza Hut from affording Lundy a longer Negotiation Period if doing so would have constituted a commercially reasonable effort to accomplish the Settlement Agreement's overarching purpose. As suggested by the delay in executing the Asset Purchase Agreement and in scheduling the arbitration, the parties had a history of agreeing to reasonable extensions of time, even in matters central to transferring control of Lundy's network to Pizza Hut. When the holidays effectively truncated the Negotiation Period, however, Lundy alleges that Pizza Hut changed course and refused reasonable extension requests in a conscious effort to frustrate Lundy's ability to pay down liens before the Negotiation Period expired. Lundy thus states that Pizza Hut failed to cooperate in achieving the Settlement Agreement's purpose, thereby breaching the implied covenant of good faith and fair dealing.

Lundy also plausibly states that Pizza Hut denied Lundy an expected benefit of the Negotiation Period.  The inclusion of a fourteen day Negotiation Period suggests that the parties acknowledged that clearing Lundy's liens could take up to two full weeks and that Lundy could expect to have that long to accomplish the task.  Lundy essentially contends that Pizza Hut knew that the delayed timing of the asset valuation made Lundy's lien-clearing obligations impracticable and used that development to increase the probability that Pizza Hut could terminate the Asset Purchase Agreement.  If true, a jury could find that Pizza Hut acted in bad faith by denying Lundy the benefit of the full two-week Negotiation Period it had bargained for in the Settlement Agreement.  Accordingly, the Court declines to dismiss Lundy's claim for breach of the covenant of good faith and fair dealing.

### D. Lundy Fails to State a Claim for Tortious Interference with Contractual Relations

After the Louisiana Supreme Court's decision in *Kline v. Eubanks*, Louisiana law barred tortious interference with contract claims for almost ninety years.  *See Am. Waste & Pollution Control Co. v. Browning-Ferris, Inc.*, 949 F.2d 1384, 1386-87 (5th Cir. 1991) (citing 33 So. 211 (1902)).  That changed in 1989, when the Louisiana Supreme Court carved out a highly circumscribed exception for cases alleging that a corporate officer breached his "duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person."  *Huffmaster v. Exxon Co.*, 170 F.3d 499, 504 (5th Cir. 1999); *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228, 234 (La. 1989) (overruling *Kline* and its progeny but explicitly refusing "to adopt whole and undigested the fully expanded

ORDER – PAGE 22

common law doctrine of interference with contract").[14] Post-*Spurney*, both the Fifth Circuit and Louisiana courts "have uniformly recognized the narrowness of Louisiana's tortious interference action" and generally have cabined it to the corporate officer context. *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 457 (5th Cir. 1999); *see also City of Alexandria v. Cleco Corp.*, 735 F. Supp. 2d 448, 455 (W.D. La. 2010) (noting that "the Fifth Circuit has declined, with broad consistency, to expand the scope of the tort beyond the facts of *Spurney*, and has often relied upon the status of the alleged tortfeasor as an officer of a private corporation in doing so").

As Lundy concedes, these authorities mandate dismissal of Lundy's claim for tortious interference with contract.[15]    Lundy attempts to recast its claim as one for tortious interference with business relations, *see* Lundy's Resp. at 19-20, which courts have recognized as a separate and distinct cause of action under Louisiana law. *See, e.g.*, *Junior Money Bags, Ltd. v. Segal*, 970 F.2d 1, 10-11 (5th Cir. 1992); *see also* LA. CIV. CODE art.

---

[14]A claim for tortious interference with contract under Louisiana law must satisfy five elements:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

*Spurney*, 538 So.2d at 234.

[15]In its response, Lundy makes no effort to defend its tortious interference with contract claim, instead asking for an opportunity to replead. *See* Lundy's Resp. at 19 n.11 ("As tortious interference with a contract is narrowly construed and limited in scope, the Lundy parties request that if the Court finds that their claim is one for tortious interference with a contract that it be given an opportunity to re-plead the claim." (citing *Spurney*, 538 So.2d 228)).

ORDER – PAGE 23

2315; *Graham v. Saint Charles St. R.R.*, 18 So. 707 (1895). Lundy titles its "third claim for relief" as for "tortious interference with contractual relations and prospective economic advantage." Lundy's Answer at 34 (emphasis removed). And, Fifth Circuit precedent exists that supports construing a claim premised on "prospective relation[s]" as one for tortious interference with business relations. *See Money Bags*, 970 F.2d at 10 (citing RESTATEMENT (SECOND) OF TORTS § 766B).

But, Lundy's third claim fails even if construed as one for tortious interference with business relations. "Louisiana law protects the businessman from 'malicious and wanton interference,' permitting only interferences designed to protect a legitimate interest of the actor." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 601 (5th Cir. 1981) (citations omitted). "Thus, the plaintiff in a tortious interference with business suit must show by a preponderance of the evidence that the defendant improperly influenced others not to deal with the plaintiff." *Money Bags*, 970 F.2d at 10 (internal quotation marks and citations omitted). That showing also requires evidence of malice. *Dussouy*, 660 F.2d at 602.

Lundy, however, fails to state facts explaining how Pizza Hut's interference was improper or malicious. Instead, Lundy only conclusorily alleges that Pizza Hut "knowingly and intentionally used it [sic] power as the franchisor . . . to influence McLane to terminate the Revised Distribution Agreement." Lundy's Answer at 35. How, Lundy does not say. And, the fact that Lundy and McLane were the only parties to the distribution agreement does not create a plausible inference of impropriety or maliciousness on Pizza Hut's part. As Lundy notes, McLane "was the exclusive distributor to [Lundy Enterprises] for all Pizza Hut food and packaging products." *Id.* at 28. Lundy's pled facts, then, more plausibly

suggest the existence of a licensing agreement between McLane and Pizza Hut governing McLane's authority to distribute Pizza Hut-licensed products. Yet, Lundy makes no effort to show that, considered in the context of a three-way relationship with McLane and Lundy, Pizza Hut acted improperly, let alone with malice. Accordingly, to the extent Lundy brings a claim for tortious interference with business relations, the Court dismisses that claim too. But, because precedent suggests that "the appropriate course [when a plaintiff fails to plead impropriety or malice] is to allow the plaintiff to amend his complaint to make the necessary allegations," *Dussouy*, 660 F.2d at 602, Lundy may replead this claim.

### IV. THE COURT GRANTS IN PART AND DENIES IN PART PIZZA HUT'S ALTERNATIVE MOTION TO STRIKE

Pizza Hut moves in the alternative under Rules 12(f) and 9(b) that the Court strike paragraphs seven through seventy-nine of Lundy's counterclaims and affirmative defenses nine and ten of Lundy's Answer.

#### A. *Pizza Hut Fails to Show Lundy's Factual Allegations are Immaterial or Prejudicial*

Rule 12 provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). The decision to strike material from a pleading lies within the district court's "considerable discretion." 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1382, at 433 (3d ed. 2004) [hereinafter "WRIGHT & MILLER"].

> However, because federal judges have made it clear, in numerous opinions . . . in many substantive contexts, that Rule 12(f) motions to strike . . . are not favored, often being considered purely cosmetic or time wasters, there appears to be general judicial agreement, as reflected in the extensive case law on the subject, that they should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy

and may cause some form of significant prejudice to one or more parties to the action.

*Id.* at 433-41 (footnotes, internal quotation marks, and citations omitted); *see also Augustus v. Bd. of Pub. Instruction*, 306 F.2d 862, 868 (5th Cir. 1962) (observing that "'it is well established that the action of striking a pleading should be sparingly used by the courts. * * * It is a drastic remedy to be resorted to only when required for the purposes of justice. * * * . . . [or] when the pleading to be stricken has no possible relation to the controversy.'" (quoting *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953))) (asterisks in original).

Pizza Hut makes three arguments in favor of striking material from Lundy's counterclaims. First, Pizza Hut contends that the allegations in paragraphs seven through seventy-nine are immaterial as they "focus on purported 'wrongdoing by [Pizza Hut]' commencing with Lundy Enterprises' acquisition of the stores in the early 1990s." Pizza Hut's Mot. at 14. Second, Pizza Hut asserts that the "allegations fall squarely within the scope of the" Settlement Agreement provision in which the "[p]arties agreed to release all claims against each other including all claims, debts, liabilities and obligations." *Id.* at 15 (citation and internal quotation marks omitted). Finally, Pizza Hut contends that the allegations are a "substantially prejudicial . . . . laundry list of alleged 'bad acts' [that] do not relate to the causes of action alleged . . . and serve no purpose other than to deliberately paint [Pizza Hut] in as unfavorable of a light as possible both to the Court and the public." *Id.* at 15-16.

These arguments fail. The targeted allegations concern in part the history of the parties' past dealings. Among other things, the Court finds that information material and relevant to understanding the parties' intentions and actions in negotiating and performing the Settlement Agreement and helpful context to Lundy's claim for breach of the covenant of good faith and fair dealing. The allegations are similarly helpful in establishing Lundy's standing in the New Orleans community, information relevant to ascertaining the scope of any damages to Lundy's goodwill as a result of Pizza Hut's alleged breach of the nondisparagement clause. Because Lundy brings no claims based specifically on the ostensibly immaterial paragraphs, they do not implicate the Settlement Agreement's claims-release provision. And, Pizza Hut identifies no – let alone significant – potential prejudice other than that Lundy's allegations paint Pizza Hut in a negative light. Were that the standard for finding prejudice sufficient to strike factual allegations, very few would survive. Accordingly, the Court denies Pizza Hut's Rule 12(f) motion to strike. *Cf.* WRIGHT & MILLER § 1382, at 446-49 ("The Rule 12(f) motion to strike allegedly offensive matter also will be denied if the allegations might serve to achieve a better understanding of the plaintiff's claim for relief or perform some other useful purpose in promoting the just and efficient disposition of the litigation.") (footnotes and citations omitted).

### B. Lundy Fails to Plead Fraud Affirmative Defenses with Sufficient Particularity

Pizza Hut's Rule 9(b) motion to strike, however, fares better. "The elements of fraud include: 1) a misstatement or omission; 2) of material fact; 3) made with the intent to defraud; 4) on which the plaintiff relied; and 5) which proximately caused the plaintiff's injury." *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (citation omitted).

As a result, "[p]leading fraud with particularity in [the Fifth] [C]ircuit requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" *Id.* (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)) (last alteration in original).

Lundy's ninth and tenth affirmative defenses neither contain any of that information nor incorporate by reference the allegations associated with Lundy's counterclaims. Instead, Lundy's ninth affirmative defense conclusorily states that Pizza Hut "acted fraudulently in the performance of the [agreements] which [are] the subject of this action and has otherwise breached its duty to act in good faith under [the] agreements, and that recovery is therefore barred." Lundy's Answer at 7-8. Lundy's tenth affirmative defense provides only that the agreements "are void and unenforceable because [Pizza Hut] intentionally and fraudulently induced the Lundy Parties to enter into those agreements." *Id.* at 8. Even if the Court looked to the counterclaim allegations, the affirmative defenses fail to give any indication of the specific facts underlying each that satisfy Rule 9(b)'s heightened pleading requirement. Accordingly, the Court strikes Lundy's ninth and tenth affirmative defenses.

## CONCLUSION

The Court thus denies in part and grants in part Pizza Hut's motion. The Court dismisses Lundy's claims for tortious interference with contract and business relations. The remainder of Lundy's claims, however, survive. The Court declines to strike portions of the allegations supporting Lundy's counterclaims, but does strike Lundy's ninth and tenth affirmative defenses for noncompliance with Rule 9(b)'s heightened pleading requirement. The Court grants Lundy leave to replead within thirty (30) days of the date of this Order.

Signed September 19, 2011.

_____
David C. Godbey
United States District Judge